**COMMUNITY SERVICE, INC., and Consolidated Television Cable Co., Petitioners,**

v.

**UNITED STATES of America and Federal Communications Commission, Respondents.**

**Kentucky Central Television, Inc., and WLEX–TV, Inc., Intervenors.**

No. 18653.

United States Court of Appeals
Sixth Circuit.
Nov. 12, 1969.

Arthur Stambler, Washington, D. C., Jason L. Shrinsky, Washington, D. C., on brief, for petitioners.

Lenore G. Ehrig, Federal Communications Commission, Washington, D. C., Edwin M. Zimmerman, Asst. Atty. Gen., Gregory B. Hovendon, Atty., Department of Justice, Washington, D. C., Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, Joseph A. Marino, Counsel, Federal Communications Commission, Washington, D. C., on brief, for respondents.

George H. Shapiro, Washington, D. C., Earl S. Wilson, Edwin F. Schaeffer, Jr., Lexington, Ky., Harry M. Plotkin, Washington, D. C., on brief; Kincaid, Wilson & Trimble, Lexington, Ky., Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., of counsel, for intervenors.

Before O'SULLIVAN, PHILLIPS and COMBS,* Circuit Judges.

O'SULLIVAN, Circuit Judge.

Community Service, Inc. and Consolidated Television Cable Co. both operators of CATV (community antenna television [1]) systems in Frankfort, Kentucky,

---

* Judge Combs, a member of the panel to which this cause was originally assigned, recused himself and the parties agreed that the case be heard and disposed of by Judges O'Sullivan and Phillips.

1. Community antenna television systems are defined as follows by FCC Rule 21.710(a), 47 C.F.R. § 21.710(a):

"The term 'community antenna television system' ('CATV system') means

have filed petitions for review, under 47 USC § 402(a), of decisions of the Federal Communications Commission entered April 18, 1967. These decisions denied petitioners' requests for waiver of the FCC's so-called "non-duplication" rule, Rule 74.1103(e),[2] which requires CATV systems, upon demand of nearby television stations (in this case, two stations in Lexington, Kentucky), to refrain from transmitting from more distant stations programs which are also carried at the same time or at another time on the same day by the nearby Lexington stations.

CATV systems, such as petitioners', are a service supplementary to television stations. They pick up television signals by means of receiving antennae at elevated locations, amplify the signals and relay them by cable to the homes of individuals for a monthly fee. In Frankfort the monthly charge is two dollars. Such systems are most advantageous in communities which would otherwise experience poor video reception due to their great distance from television stations or some geographic obstacle such as mountainous terrain between the community seeking TV reception and the station.

While there was initially some disagreement among the Circuits as to whether the FCC did have jurisdiction to regulate CATV systems[3], this uncertainty was put at rest by the Supreme Court decision in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), which sustained the FCC in its assertion of jurisdiction. However, the particular regulation here involved, § 74.1103(e), was not there before the Supreme Court, which was careful to delimit the reach of its decision:

> "We must first emphasize that questions as to the validity of the specific rules promulgated by the Commission for the regulation of CATV are not now before the Court." 392 U.S. at 167, 88 S.Ct. at 2000.

The validity of the non-duplication rule—§ 74.1103(e)—as it has been enforced by the FCC in this case is open for our consideration. Several other circuits have upheld the non-duplication rule as applied to the varying facts of the respective decisions. Conley Electronics Corp. v. F. C. C., 394 F.2d 620, 623–624 (10th Cir. 1968), cert. denied, 393 U.S. 858, 89 S.Ct. 127, 21 L.Ed.2d 127 (1968); Titusville Cable TV, Inc. v. United States, 404 F.2d 1187, 1189–1190 (3d Cir. 1968); Black Hills Video Corp. v. F. C. C., 399 F.2d 65 (8th Cir. 1968); Total Telecable, Inc. v. F. C. C., 411 F.2d 639 (9th Cir. 1969). Petitioners contend:

> "Commission Rule § 74.1103(e) *as here applied* to preclude any substantive consideration of petitioners' waiver requests, denies them procedural due process of law and is otherwise arbitrary, capricious and contrary to statutory requirements."

If this regulation stood alone with no provision for relief from its rather

---

any facility which, in whole or in part, receives directly or indirectly over the air and amplifies or otherwise modifies the signals transmitting programs broadcast by one or more television stations and distributes such signals by wire or cable to subscribing members of the public who pay for such service * * *."

2. Rule 74.1103(e), 47 C.F.R. § 74.1103(e), provides:

"*Stations entitled to program exclusivity.* Any such system which operates, in whole or in part, within the Grade B or higher priority contour of any commercial or noncommercial educational television station or within the community of a fourth priority television translator station, and which carries the signal of such station shall, upon request of the station licensee or permittee, maintain the station's exclusivity as a program outlet against lower priority or more distant duplicating signals, but not against signals of equal priority, in the manner and to the extent specified in paragraphs (f) and (g) of this section."

3. See, e. g., Southwestern Cable Co. v. United States, 378 F.2d 118 (9th Cir. 1967); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967).

drastic commands, no matter what the circumstances, we would have grave doubt of its constitutionality vis-a-vis the Fifth Amendment's requirement of due process. In *Southwestern Cable*, the Supreme Court observed that,

"The Commission has acknowledged that, in this area of rapid and significant change, there may be situations in which generalized regulations are inadequate, and special or additional forms of relief are imperative." 392 U.S. at 180, 88 S.Ct. at 2007.

We are of the view that § 74.1103(e) is saved from constitutional infirmity by Regulation 74.1109, 47 C.F.R. § 74.1109, which sets out procedure for obtaining waiver of application of § 74.1103(e) and other regulations.

The denial of petitioners' efforts to obtain such waiver is the subject matter of this appeal. We are satisfied that petitioners' claims to entitlement to such a waiver were not considered or disposed of upon the merits by the FCC, but were denied for procedural faults.

Petitioners have each operated a CATV system in Frankfort since 1952. At that time the FCC did not assert or claim jurisdiction to regulate CATV systems. Community is a non-profit, municipally owned corporation which provided CATV service to 4,285 subscribers at the beginning of the dispute before us. "Early in 1952 the Municipal Board determined that the residents of the City of Frankfort required service of a television cable system in order for these people to receive any satisfactory television signals." (From petitioners' brief) Whatever monies were earned by Community over its costs of operation have been used by Frankfort for local charities and other municipal endeavors. Consolidated is a privately owned corporation and supplies service to 2,700 subscribers in an area of Frankfort not served by Community. Frankfort has no television station. Although it is located only twenty-five miles from two stations in Lexington, Kentucky, and under normal circumstances viewers in Frankfort would receive a good picture (a "Grade A signal") from those stations, normal circumstances are not here present. The information given the FCC by petitioners indicates that, unaided by CATV, at least two-thirds of the television sets in Frankfort would be unable to receive adequate reception (a "Grade A or Grade B signal") from Lexington or from Louisville or Cincinnati (the latter two cities being fifty and seventy-five miles distant from Frankfort, respectively) because most of Frankfort is located in a deep river valley.

The TV stations at Lexington which have intervened before the FCC and this Court and were successful in opposing petitioners' efforts to obtain a waiver of the relevant rule, began operation there in 1955 (WLEX-TV) and 1957 (WKYT). Both are UHF stations. Petitioners, which previously carried the Louisville and Cincinnati stations, began to carry the Lexington stations when they came on the air. The number of Frankfort subscribers of the petitioning CATV systems—approximately 7,000—represent substantially 4% of the television owners within the total area served by the Lexington television stations.

In 1965, the Federal Communications Commission issued its First Report and Order, published at 38 FCC 683, which asserted regulatory jurisdiction over microwave CATV systems. Jurisdiction by the FCC of non-microwave systems, such as the petitioners here, was claimed in its Second Report and Order, 2 FCC (2) 725, which was adopted on March 4, 1966. The matter of the taking of such jurisdiction and adopting regulations to control the growth of CATV had been under consideration for some time, although as late at 1959 the FCC had decided it did not possess the requisite statutory authority for regulation of CATV. Legislation to give it such authority was introduced in Congress, but failed of passage. The FCC, however, later determined that without any specific relevant statute it had jurisdiction to regulate CATV. It began preparation of appropriate regulations which were

finally adopted by the FCC in its order of March 4, 1966, making such regulation effective April 18, 1966. See Second Report and Order, 2 FCC(2) 725, 789. Such Order provided that Rule 74.1103 would not become effective as to existing operations of non-microwave CATV systems until 60 days later, or June 18, 1966. The Lexington stations responded promptly. In June, 1966, they requested petitioners to comply with § 74.1103(e) and to accord them the exclusivity which the regulation called for.

Immediately after the Lexington TV stations' requests for compliance, petitioners filed requests with the FCC for waiver of § 74.1103(e). These requests were quite informal and brief, as was invited by FCC Regulation 74.1109(b), 47 CFR § 74.1109(b), which states that the "petition may be submitted informally by letter," but did require that proof of service on interested parties accompany the petition. The petitions, however, failed to comply with subsection (c) (1) of the regulation which required that factual allegations "shall be supported by affidavit of a person or persons with actual knowledge of the facts * * * 4." The two Lexington stations, intervenors here, filed oppositions to the requests. The petitioners then filed responses to the intervenors' oppositions and the last of these pleadings were filed in September, 1966. On April 18, 1967, the FCC disposed of and denied the petitions of Community and Consolidated by filing in each cause a Memorandum Opinion and Order. We quote paragraph three from the denial to Community:[5]

"When it adopted the Second Report and Order, the Commission established a scheme of same-day program exclusivity on a priority basis governed by predicted contours. The Commission considered the problem of disruption of viewing habits, but concluded that same-day program exclusivity represented a fair balance of the competing interests in the absence of any unique factors. Community has shown no special circumstances which would warrant a departure from this determination. The Second Report and Order also explains why we must reject arguments based on either impact on a station's total audience, or off-the-air reception. Community's argument that no local station could be established is both speculative and indecisive as justification for a waiver. Community's general allegations concerning the strength of Lexington signals are unsupported and must also be rejected. Petitioner's interpretation of Section 74.1103(b) (3) is incorrect, since WKYT-TV is not a television translator station. Likewise, petitioner's suggestion that it will no longer carry the local stations if the waiver is not granted would be inconsistent with Section 74.1103(a) of the Rules." —— FCC(2) ——.

Aside from recitation of the Commission's policy considerations, the opinion's expressed reasons for denial were that the petitioners described no special circumstances which would warrant a departure from FCC policy and that their allegations concerning the strength of

---

4. Failure to supply such an affidavit was not relied upon by the FCC in denying the relief sought.

5. Paragraph three of the denial to Consolidated reads as follows:
   "When it adopted the Second Report and Order, the Commission established a scheme of same-day program exclusivity on a priority basis governed by predicted contours. The Commission considered the problem of disruption of viewing habits but concluded that same day program exclusivity represented a fair balance of the competing interests,

in the absence of any unique factors. Consolidated has shown no special circumstances which would warrant a departure from this determination. The Second Report and Order also explains why we must reject arguments based on either impact on a station's total audience or off-the-air reception. Consolidated's argument that no local station could be established is both speculative and indecisive as justification for a waiver. Finally, Consolidated's general allegations concerning the strength of Lexington signals is unsupported and must be rejected."

Lexington signals were "unsupported and must be rejected."

We think that the Commission failed to sufficiently articulate its grounds for denial so as to permit proper review. Consolidated's initial petition averred:

"It is the purpose and intention of Consolidated T.V. Cable Service to provide the widest program selection and best reception possible for all of the subscribers. In so doing it benefits all stations carried by it by transmitting their signals into what would otherwise be an · inaccessible valley area where such signals could not be received.

"No local television station is maintained or operating in the Frankfort area. The location of a station in this area is economically unfeasible as a consequence of the small population and the unusual topography of the area."

In Consolidated's reply to the oppositions filed by the intervening Lexington stations, it was asserted that:

"2. In adopting the substantive provisions of the CATV rules (i. e. carriage and non-duplication protection), the Commission recognized that strict compliance with the rules would, in some instances, be detrimental to the public interest, in addition to creating hardships for individual CATV systems or television stations. Accordingly, the Commission indicated its willingness to grant *ad hoc* consideration to petitions for waiver of the rules. Petitioner submits that public interest considerations dictate Commission waiver of the non-duplication provisions of its rules as applied to WLEX-TV and Taft."

\* \* \* \* \* \*

"6. The above figures emphatically demonstrate that television viewers in Frankfort have their greatest interest in the television programming of the Louisville stations. To compel these viewers to reorient their viewing habits would indeed clearly disserve the public interest.

"7. Imposition of the non-duplication rules would not only create an artificial monopoly in favor of the Lexington stations against the expressed wishes of area residents, it would also serve to create an unjust and discriminatory situation. More than 90% of the homes which can receive the Lexington stations off-the-air can also receive the signals of the Louisville and Cincinnati stations. It is obvious that in these homes the viewers will continue to watch the Louisville stations, while in CATV homes the enforced black-out provisions will force subscribers to watch what in most cases will be an undesired station. This will result in a loss of subscribers to Petitioner as those persons who are able to pick-up Louisville and Cincinnati off-the-air will disconnect CATV service in order to freely receive the stations of their choice.

"8. The 2,700 odd subscribers to Petioner's CATV system constitute but 1.5% of the net weekly circulation of the Lexington stations. There is, therefore, no possibility that those stations will suffer adverse effects of the viewing preference of the Frankfort residents is allowed to take precedence over strict enforcement of the CATV rules. Petitioner will carry WLEX-TV and Taft, enabling these stations to compete with the other stations carried on an equal basis, without affording the stations a monopolistic position which is both unwarranted and undesired."

In Community's petition for waiver, it was averred that:

"1. Frankfort, Kentucky, is located in a steep river valley and as a consequence, the area served by Community Service, Inc. is not within either the A or B contour of WKYT-TV, judged by the strength and usability of that station's signal in this area.

"2. Community Service, Inc. serves 4200 TV homes in Frankfort, Kentucky. WKYT-TV has 175,000 TV homes in its viewing area, according to

the Television Fact Book. The homes served by our cable represent only 2.3% of the total homes in the station's area. This small percentage cannot have any conceivable impact financial or otherwise, on the TV station involved.

"3. Community Service, Inc. now carries WKYT-TV on its cable, on one channel, full-time, and does so with no material degradation in the quality of its signal. It fully intends to continue to carry this station unless this waiver is denied and the notices for non-duplications creates an impracticable situation from an operational standpoint. Our service is maintained for the sole purpose of providing the best reception possible for our subscribers, and in so doing, it benefits all stations carried by extending their signals into a valley area which would otherwise not receive them.

"4. There is no local TV station in the Frankfort area and in our judgment, a local station is not feasible because of the small population and the unusual terrain surrounding the area."

After these various presentations were made, the FCC made no request of Community or Consolidated to provide better support for its claims. It kept the matter before it and denied the requests of petitioners on April 18, 1967. We do not consider that the FCC's brief and uninformative observations that "general allegations concerning the strength of Lexington signals is unsupported and must be rejected," and that neither petitioner had shown "special circumstances which would warrant a departure from this determination," provide information that the applications for waivers were adequately considered by the Commission. The mentioned "determination" is that contained in the FCC's Second Report and Order, 2 F.C.C. (2) 725, 747 (1966).

Thus rebuffed by the statement that one of their asserted grounds for waiver, viz, the lack of strength of the Lexington stations, was "unsupported," the petitioners employed a firm of consulting radio engineers to prepare an extensive study and report which, with greater particularity and scientific analysis, supported the allegations of their initial petitions. Armed with this report, Community and Consolidated, on or about July 17, 1967, petitioned the FCC for reconsideration of its decisions.[6] These petitions and ac-

6. Preliminary to completion of the engineering study, and on May 7, 1967, following the Commissioner's order of April 8, one Ben B. Fowler, a Frankfort lawyer and a member of the Board of Directors of Community Service, Inc., filed an affidavit with the FCC verifying on oath the basic allegations of Community's original request for waiver. He deposed that:

"[Affiant] states that, based on his knowledge of the community and its television reception problems, the fact is that the Lexington, Kentucky television stations, WLEX and WKYT, do not furnish a usable signal in this community for off-air reception by rooftop antenna. In the request for waiver this allegation was made. He states that it was, and is, his intention in making such an allegation to furnish proof of the allegation when, and if, such proof was required or whenever the Commission would allow an opportunity for proof. So far as he knew, or could ascertain, there was no rule of the Commission requiring that the allegation of the waiver request be accompanied by proof. He states that he was encouraged in this belief by the fact that both stations in their written opposition to Community's request for waiver made no effort to deny the allegation. As the record stands, the allegation is admitted.

"Affiant further states that the allegations can be proved to the satisfaction of the Commission and that he is seeking for Community Service an opportunity to furnish such proof. That in furtherance of this effort Community has employed the engineering firm of Silliman, Moffett and Kowalski, of Washington, D.C. to survey, collect and analyze data relating to the strength and adequacy of the television signals available in this community, and to prepare their analysis for presentation to the Commission. * * * Affiant states that Community Service is asking solely for sufficient time to allow an adequate engineering study to be completed and for a 'day in court' which has not been allowed to it to date."

* * * * *

"Affiant further states that WLEX and WKYT, together, [the intervenors]

companying engineering report reiterated the averment that, unaided by the services of the Frankfort CATV systems, only a small percentage of Frankfort viewers would be able to receive an adequate picture from the Lexington stations, and that any disadvantage to the Lexington TV stations was quite insignificant when weighed against the claimed damage that would ensue to the petitioners.

We do not profess ability to appraise the validity of the scientific data and conclusions in the engineering report, but it appears to support the facts relied upon by petitioners for the relief they ask. It was presented to the FCC in support of the petitions for reconsideration. We are aware that the opinions of hired experts need not be accepted as controlling by the FCC but, absent demonstrable unreliability, we assume that such opinions will be considered.[7]

On March 19, 1968, some eight months after the petitions were filed, the Commission released its Memorandum Opinion and Order denying such petitions.[8] The Opinion and Order recited in relevant part:

"2. In its cited actions, the Commission denied requests for waiver of the program exclusivity requirement of Section 74.1103(e) of the Commission's Rules filed by Community and Consolidated, in part because of lack of support for allegations concerning the signal strength of the Lexington stations. Petitioners now seek to introduce an engineering study concerning signal strength. But the showing of good cause required by Section 1.106 (c) of the Commission's Rules for reconsideration has not been made, Durfee's TV Cable Co., FCC 67–911, 9 FCC 2d 652. Nor does it appear that petitioners' attempted showing could overcome the allocations policy recently reaffirmed in Shen-Heights TV Association, FCC 68–168, —— FCC 2d ——.

offer all three national television networks. The non-duplication requirement would cause Community Service to black out each day portions of the programs from all six of the other channels offered to its subscribers. He states that he has checked the current TV Guide for the date May 6, 1967, and that in order to conform to the non-duplication requirements of each Lexington station it would be necessary to perform twenty-three separate switches at Community Service's tower on that day alone. He states that it would also be necessary for Community Service to make available to each subscriber a daily program showing the channels on which many TV programs would be available."

7. Buttressed by exposition of the scientific data relied upon, the engineering report asserted that:
"2. In summary then, it is the writer's engineering opinion that the Lexington stations, WLEX-TV and WKYT-TV, are not entitled to program exclusivity in Frankfort, based on superiority of grade of service. The small, lightly populated islands of Grade A service within the city limits are more than offset by the large, heavily populated areas in that city which now receive less than Grade B service.

"23. In this regard, it is further noteworthy that the Lexington stations have not made anywhere near the maximum possible effort to serve the people of Frankfort in the capital of their state. With transmitter antenna combinations readily available to produce 1 million watts of ERP and with recently announced transmitter-antenna combinations that will permit ERP's of up to the 5 million watt maximum permissible, WLEX-TV has only 300 Kw maximum and WKYT-TV the even smaller 215 Kw. Their antenna heights of 640 feet AAT do not begin to approach the maximum permissible 2,000 feet AAT. Neither station has an application pending as of this date to improve these facilities.
"24. The Lexington, State Board of Education, Educational Station with a construction permit for 586 Kw (Maximum) ERP at an antenna height of 870 feet AAT will materially surpass both of the commercial operators in service to Frankfort."

8. Commissioner Bartley dissented, Commissioner Loevinger concurred in the result, and Commissioner Wadsworth was absent.

"3. In view of the foregoing, we find that our above-cited actions were consistent with the public interest."

This quotation constitutes the total advice given to the petitioners to tell them why they were denied the relief sought. It, coupled with the Commission's initial Opinion and Order, likewise is all that is given us as the material upon which we are to exercise our power of review of the order of the Commission. We find it inadequate for such purpose. We respectfully observe that it too easily dispatches the attempted assertions of claimed rights of two "small town enterprises" vis-a-vis restrictions imposed on them to protect the growth and economic security of the UHF television stations in such larger communities as Lexington.

Upon adoption of the non-duplication rule, the FCC recognized that there must be situations where the imposition of the rule would be unjust. It provided, by Rule 74.1109, that in such case it would grant a waiver. The orders first denying the requested waivers and later denying the petitions for reconsideration inform us only that the arguments presented by Community and Consolidated do not constitute a situation entitling them to waivers.

Congress has imposed upon the FCC a statutory duty to include within any order denying a petition such as the ones herein a "brief statement of the grounds for denial." This duty is outlined in 5 U.S.C. § 555(e), as follows:

"Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial."

We are of the view that this duty was not fulfilled in this case.

Other courts have held that similarly vague FCC orders were insufficient to allow proper judicial review. In West Michigan Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 396 F.2d 688 (1968), Judge J. Skelly Wright observed:

"[I]n order for a court to exercise in any meaningful way its function of review, it is necessary that the Commission state specifically the basis for each of its conclusions." 396 F.2d at 691.

The opinions of the FCC in this case suffer from the vice set out in the quoted language of Judge Wright. If the FCC's orders mean to say that, even though the Lexington TV stations could not generally put a receivable signal into Frankfort without the aid of the petitioning CATV systems, and even if enforcement of the exclusivity regulation § 74.1103(e) would visit serious harm to petitioners without a balancing benefit to the intervenors, no waiver should be granted, we would consider that such decision was an arbitrary and capricious exercise of the FCC's authority.

Upon receipt of the original petitions for waivers by the Frankfort CATV systems, the Commission gave no notice that they were formally inadequate or that more detailed information should have been provided. As presented these petitions did clearly aver that the Lexington TV stations did not provide any significant signals into Frankfort and that only by the assistance of petitioners were the Lexington stations enjoying an audience in Frankfort and that enforcement of the exclusivity regulation would do serious harm to petitioners without a balancing benefit to the Lexington intervenors.

In KGMO Radio-Television, Inc. v. FCC, 119 U.S.App.D.C. 1, 336 F.2d 920 (1964), the Court dealt with the FCC's denial of a petition for reconsideration of its action in granting without a hearing a construction permit to a TV station against the objections of the petitioner. The FCC dismissed the petition for reconsideration upon the ground that "the facts alleged * * * are too generally stated and are not sufficiently related to the conclusions drawn" to call for the relief sought by the petition for reconsider-

ation. In remanding the matter to the Commission, the Court said:

"We think it is within the Commission's authority to require more information than appellant gave. But since appellant had no notice, in the Commission's past decisions or otherwise, that more would be required, the petition should not be denied on the ground that more was not furnished. We therefore remand the case to the Commission. Unless it decides the case on other grounds, it should permit appellant to amend and amplify the petition." 336 F.2d at 922.

In Presque Isle TV, Inc. v. United States, 387 F.2d 502 (1967), the First Circuit considered a Maine CATV system's petition to review an FCC order forbidding it to carry television programs from Canada which were shown before they were released on American stations. The system presented the FCC with uncontroverted data concerning the strength of the Canadian station's signal and economic impact. The FCC's order gave no indication that it considered this data just as, in this case, it apparently did not consider the petitioners' engineering report. The Court vacated the FCC's order, concluding:

"Had the Commission ruled that petitioners' claim concerning signal strength was correct but irrelevant, particularly if some reasoning had been given, its decision and order might have been supportable. * * * The Commission, however, was unwilling to make these decisions, and its shutting its eyes to conspicuous facts is some measure of its unwillingness. Within broad limits the Commission may make policy determinations, but if review is to have any meaning the Commission cannot, in effect, back into them without openly making them, by ignoring the facts presented." 387 F.2d at 508.

The Supreme Court in NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965), recognized that administrative agencies must articulate the reasons for their decisions in order to ensure proper review. Although dealing with an NLRB order, the Court's comments are equally applicable to the FCC. The Court stated,

"When the Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271." 380 U.S. at 443, 85 S.Ct. at 1064.

In its order denying the petitions for reconsideration, released March 19, 1968, the Commission stated:

"[T]he showing of good cause required by Section 1.106(c) of the Commission's Rules for reconsideration has not been made, Durfee's TV Cable Co., FCC 67–911, 9 FCC 2d 652."

Rule 1.106(c), 47 C.F.R. § 1.106(c), reads as follows:

"A petition for reconsideration which relies on facts which have not previously been presented to the Commission or to the designated authority, as the case may be, will be granted only under the following circumstances:

(1) The facts relied on relate to events which have occurred or circumstances which have changed since the last opportunity to present such matters;

(2) The facts relied on were unknown to petitioner until after his last opportunity to present such matters, and he could not through the exercise of ordinary diligence have learned of the facts in question prior to such opportunity; or

(3) The Commission or the designated authority determines that consideration of the facts relied on is required in the public interest."

We do not consider that this regulation applies because the engineering study which was filed in support of the petitions for reconsideration cannot be considered "facts which have not previously been presented to the Commission."

The engineering report and the other averments of the petitions for reconsideration were but *supportive* of the basic facts previously articulated in the original petitions for waiver. The Commission's opinion in *Durfee's, supra,* relied chiefly on the rule of res judicata. If *Durfee's* has any relevant precedential importance, we decline to follow it. We likewise hold that the "good cause" alleged to be required by § 1.106(c) was not wanting in the petition for reconsideration.

The final March 19, 1968 order of the FCC also stated:

"Nor does it appear that petitioners' attempted showing could overcome the allocation policy recently reaffirmed in Shen-Heights TV Association, FCC 68–168, —— FCC 2d ——".

We read Shen-Heights [9] as not "reaffirming" the Commission's established policy on granting waivers, but as a vehicle whereby the FCC widened the reach and tightened the grip of Rule 74.1103 (e). The Commission stated therein:

"In short, CATV, as an interstate communication by wire which makes integral use of TV broadcast signals and particularly affects the service areas of stations, must serve the carriage and non-duplication requirements of our rules *even though a viewable off-the-air picture is not available in any part of the CATV community,* and may obtain a waiver of these requirements only upon a substantial showing of unusual or exceptional circumstances justifying such action." (Emphasis supplied) —— FCC(2) at ——.

This appears to be in contrast to the Commission's original policy as expressed in its Second Report and Order, 2 FCC (2) 725 (1966), which stated:

"As in the case of our present policy with respect to microwave systems, carriage [of the signal of a TV station] will not be required where a sufficient showing is made that a predicted signal is not in fact present in the community or that a good signal is not obtainable because of technical deficiencies on the part of the station." [2] FCC (2) at 753, fn. 40.

As written, Rule 74.1103(e) would apply only to systems "which operate in whole or in part within the Grade B or higher priority contour of any commercial station * * *." These contours (which determined predicted quality of television reception) were not designed to be immovable standards.[10] The Commission, in its First Report and Order, 38 FCC 683 (1965), described them as "useful rules of thumb," stating:

"In dealing with both the carriage and the nonduplication requirements, we have made liberal use of the signal contour concepts embodied in our rules. As proposed in our notices, these references were entirely to predicated contours. As we have stated several times, however, signal contours are, in the present context, useful rules of thumb. And, as we have repeatedly recognized, the methods of prediction specified in our rules are based on various assumptions as to terrain and other factors, which may not necessar-

---

9. Commission members Bartley and Loevinger dissented and Commissioner Johnson concurred in the result.

10. "Contours" were explained as follows in Wheeling Antenna Co. v. United States, 391 F.2d 179, 181 (4th Cir. 1968):

"Towards the regulation of CATV, the Commission has established a predicted scope of each station. These predictions, three in number, are designated as contours. Expressed in terms of field intensities, they are in order of priority as follows: (1) Principal community contour, which 'means

the signal contour, which a television station is required to place over its entire principal community', 47 CFR 74.1103(c). This contour encompasses an area with a predicted reception acceptable to the median observer at 90% of the receiver locations 90% of the time. (2) Grade A contour denotes a field in which the predicted service is 70% and 90%, respectively, and (3) Grade B contour demarks an area with a quality of service acceptable at 50% of the locations 90% of the time. See 47 CFR §§ 21.710(c), 73.683(a) and 73.685(a)."

ily hold true in an individual instance. In the absence of other information, predictions based on our rules will be regarded as creating prima facie presumption as to the location of signal contours. With one exception to be noted later, however, any party will be free to make a showing that, because of terrain or other factors, the contours lie elsewhere. If the parties are unable to agree, the matter may be brought to us for resolution." 38 FCC at 730, 731.

The FCC thus ignored this limitation upon the application of Rule 74.1103(e) when in *Shen-Heights* it ordered its enforcement "even though a viewable off-the-air picture [a picture brought in unaided by CATV] is not available in any part of the CATV community."

In United States v. Southwestern Cable Co., 392 U.S. 157, 176, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), the Supreme Court emphasized its understanding of the purpose of the restrictions provided by § 47.1103(e), as follows:

"[T]he Commission feared that CATV might, by dividing available audiences and revenues, significantly magnify the characteristically serious financial difficulties of UHF and educational television broadcasters."

And in its Second Report and Order, the Commission said:

"[W]e have concluded in the first report an order * * * that the public interest requires that CATV systems carry local stations without duplication *for a reasonable period*, in order to avoid unfair competitive disadvantage to and prejudicial effect on existing and potential broadcast service." 2 FCC(2) at 745.

Further reading of the Second Report and Order makes clear the Commission's anxiety to protect and allow development of 'local' UHF stations against harmful competition by CATV systems. The Commission believed however that is should retain the power to consider, ad hoc, reasons for not enforcing a particular regulation. As stated above it thought that the public interest (extension and expansion of the local UHF stations) suggested that CATV systems be required to carry these UHF stations without duplication "for a reasonable period." The Commission knew, however, at the time it issued its final order in this case, that one of the Lexington stations—WKYT–TV—had reported an annual net income of $200,000 and had, on May 12, 1967, been sold by the Taft Broadcasting Company (a national, rather than a local, enterprise) for two and one-half million dollars, with the realization of a capital gain of $1,575,000. At no time did this station enjoy the nonduplication exclusivity with regard to the Frankfort CATV systems.[11] Could we have before us another situation where the chief beneficiaries of well-intentioned government regulations, designed to help the allegedly "little" people, have been the quite "big" people? Except as a theoretical conception, there has been no showing that enforcement of § 74.1103(e) was actually needed to, or did, protect the development of any UHF local TV station. The record contains no information as to the prosperity of WLEX, Inc., the other intervening Lexington UHF station. The opening of a third UHF station in Lexington indicates that CATV has not prohibited entry into the industry. Neither the facts of this case nor any disclosed surveys demonstrate that the UHF stations of Lexington have been or will be hurt for lack of enforcement of § 74.1103 (e).

█ If we are to exercise whatever judicial function is ours we must be furnished with more articulation of the reasons which prompted the FCC's decision than has been provided. In such situation it is proper that we remand the case to the Commission so that it may conduct such investigation, including an eviden-

---

11. Enforcement of § 74.1103(e) against petitioners was stayed during the proceedings before the Commission. This Court continued this stay while the matter has pended here.

tiary hearing, if necessary, to advise itself and us of whether the claims of the petitioners are true. We are not persuaded that the clear allegations of the requests for waivers and the later petitions for reconsideration if true should be insufficient to call for the granting of the waivers. Neither do we consider that these allegations can be disposed of by saying that they are "speculative," "unsupported," or that they do not "overcome the allocation of policy recently reaffirmed in *Shen-Heights T.V. Association*."

 We do not, however, require the Commission to grant petitioners an evidentiary hearing. The grant or denial of an evidentiary hearing is discretionary with the Commission. 47 C.F.R. § 74.-1109(f); Wheeling Antenna Co. v. United States, 391 F.2d 179, 182 (4th Cir. 1968); Conley Electronics Corp. v. F. C. C., 394 F.2d 620, 624–625 (10th Cir. 1968), cert. denied, 393 U.S. 858, 89 S.Ct. 127, 21 L.Ed.2d 127 (1968); Titusville Cable TV., Inc. v. United States, 404 F.2d 1187, 1191–1192 (3d Cir. 1968); Total Telecable, Inc. v. F. C. C., 411 F.2d 639 (9th Cir. 1969). We ask only that the Commission "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j).

We therefore remand this case to the Federal Communications Commission for further action consistent with this opinion. Such action will include vacation of the April 18, 1967, and the March 19, 1968, orders and such further employment of the procedures set out in the Commission's regulation § 74.1109, 47 C.F.R. § 74.1109, as the Commission believes will be necessary to make a decision capable of being judicially reviewed. Within time schedules set by the Commission the petitioners, obedient to § 74.-1109, may amend or supplement their requests for waivers and the intervenors their opposition to them. It will be for the Commission to determine what further shall be done. Section 74.1109(b) provides in part:

"The Commission may specify other procedures, such as oral argument, evidentiary hearing, or further written submissions directed to particular aspects, as it deems appropriate."

The stay of enforcement of § 74.1103 (e) as entered first by the Commission and then by this Court shall continue in effect pending further consideration of the involved waiver requests.

It is so ordered.