**MEADVILLE MASTER ANTENNA, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION**

and

**United States of Ameria, Respondents, Lamb Communications, Inc., Intervenor.**

**No. 19293.**

United States Court of Appeals, Third Circuit.

Argued Feb. 1, 1971.

Decided May 19, 1971.

Yolanda G. Barco, Barco & Barco, Meadville, Pa., (George J. Barco, Meadville, Pa., Smith, Pepper, Shack, & L'Heureux, Robert F. Corazzini, Washington, D. C., on the brief) for petitioner.

Richard R. Zaragoza, Atty., F. C. C., Washington, D. C., (Richard W. McLaren, Asst. Atty. Gen., Gregory B. Hovendon, Atty., Dept. of Justice, Richard E. Wiley, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, Stuart F. Feldstein, Counsel, F. C. C., Washington, D. C. on the brief) for respondents.

Herbert M. Schulkind, Fly, Shuebruk, Blume and Gaguine, Washington, D. C., (Howard Jay Braun, Washington, D. C., on the brief), for Intervenor Lamb Communications, Inc.

Bozic, Bozic, Thomas and Truax, John H. Bozic, Jr., Meadville, Pa., amicus curiae, on brief for subscribers.

Before McLAUGHLIN and VAN DUSEN, Circuit Judges, and HANNUM, District Judge.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is a petition for review in which the petitioner, Meadville Master Antenna, Inc. (MMA), appeals from a Memorandum Opinion and Order of the Federal Communications Commission released May 6, 1969, denying petitioner's request for waiver of the nonduplication provisions of section 74.1103(e) of the Rules of the Commission, 47 C.F.R. § 74.1103(e), adopted March 8, 1966.

Petitioner, MMA, is the owner and operator of a twelve-channel community antenna television system with 6200 subscribers, serving the City of Meadville, Pennsylvania, with a population of about 17,000, suburban and semi-rural adjacent areas with a population of about 6,000, and the boroughs of Conneaut Lake and Saegertown, Pennsylvania, with a population of about 3,000. Near the beginning of the present conflict in 1966, MMA was carrying the signals of two NBC affiliates, WICU-TV, Channel 12 in Erie, Pennsylvania, and WFMJ-TV, Channel 21 in Youngstown, Ohio. WFMJ-TV lies about 45 miles southeast of Meadville and WICU-TV lies approximately 30 miles north of Meadville.

Community antenna television systems receive distant signals by means of an antenna, amplify and relay them by cable to the sets of individual subscribing members who pay a fee for the service. First Report and Order, 38 F.C.C. 683, 684 (1963). CATV systems were intended to supplement free systems and have been utilized traditionally in com-

munities where rough terrain made off-the-air reception difficult or where sparse population made operation of a local station commercially unfeasible and so necessitated the importation of distant signals. Eventually, however, CATV systems began servicing communities already served through off-the-air reception of television signals. In response to concern expressed about the financial position of local stations faced with CATV competition, the Commission asserted jurisdiction over all CATV systems,[1] conducted inquiries, and adopted rules covering their operations.[2]

The carriage provisions of the Rules of the Federal Communications Commission provide that a CATV system must carry upon request the signals of certain local stations. The non-duplication provisions [3] of the rules contained in section 74.1103 provide that a CATV system, upon the demand of a qualifying station, must refrain from transmitting from stations with a lower priority or more distant signals programs which are also carried, at the same time or at another time on the same day, by the qualifying station.[4]

The relative priority of stations is determined by the signal strength contours placed over the CATV system's service community.[5] The Commission has pro-

1. The assertion of jurisdiction was upheld by the Supreme Court in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

2. The underlying policy reasons for the adoption of the carriage and non-duplication requirements were given in the first and second reports. First, the Commission was afraid that the importation of distant signals by CATV would cause the local stations to suffer a loss of audience and advertising revenues. First Report and Order, 38 F.C.C. 683, 697–715 (1963); Second Report and Order, 2 F.C.C.2d 725, 734–45 (1966). Second, the Commission was concerned that the "burgeoning CATV industry would have a future adverse impact on television broadcast service, both existing and potential." Second Report and Order, 2 F.C.C.2d 725, 736 (1966); see First Report and Order, 38 F.C.C. 683, 697–715 (1963).

3. This court, in Titusville Cable TV, Inc. v. United States, held that the non-duplication rule did not contravene constitutional guarantees of free speech. 404 F.2d 1187 (3d Cir. 1968).

4. Rule 74.1103(e), 47 C.F.R. § 74.1103 (e), provides:

(e) Stations entitled to program exclusivity.

Any such system which operates, in whole or in part, within the Grade B or higher priority contour of any commercial or noncommercial educational television station or within the community of a fourth priority television translator station, and which carries the signal of such station shall, upon request of the station licensee or permittee, maintain the station's exclusivity as a program outlet against lower priority or more distant duplicating signals, but not against signals of equal priority, in the manner and to the extent specified in paragraphs (f) and (g) of this section.

Rule 74.1103(f), 47 C.F.R. § 74.1103(f) provides:

(f) Program exclusivity; extent of protection.

Where a station is entitled to program exclusivity, the CATV system shall, upon the request of the station licensee or permittee, refrain from duplicating any program broadcast by such station, on the same day as its broadcast by the station, if the CATV operator has received notification from the requesting station of the date and time of its broadcast of the program and the date and time of any broadcast to be deleted, as soon as possible and in any event no later than 48 hours prior to the broadcast to be deleted. Upon request of the CATV system, such notice shall be given at least eight days prior to the date of any broadcast to be deleted.

5. The Court in Wheeling Antenna Co. v. United States, 391 F.2d 179, 181 (4th Cir. 1968), explained that a contour represents a prediction by the Commission as to the signal strength of a station over a selected area. There are three of these contours and " * * * they are in order of priority as follows: (1) Principal community contour, which 'means the signal contour, which a television station is required to place over its entire principal community,' 47 C.F.R. 74.1103(c). This contour encompasses an area with a predicted reception acceptable to the median observer at 90% of the receiver locations

vided in section 74.1109 for the waiver of the non-duplication provisions when the need of petitioner and the public interest so requires.

On June 1, 1966, WICU-TV requested petitioner MMA to provide program exclusivity for WICU-TV as against WFMJ-TV. WICU-TV has a predicted principal city (city grade) contour while WFMJ-TV has a predicted Grade B contour. MMA refused and, on July 1, 1966, filed a petition for waiver of the non-duplication rules on the grounds that (1) the signal strength of WICU-TV's signal was inferior or no better than the signal strength of WFMJ-TV in most of Meadville; (2) the signal quality of WICU-TV was substantially inferior to that of WFMJ-TV both in color and in black and white; (3) there was a community of interest between Meadville and Youngstown; and (4) the Commission's long-standing policy of encouraging the development of UHF television favored waiver in this instance since WFMJ-TV is a UHF station and WICU-TV is a VHF station. On September 1, 1966, Lamb Communications, Inc., the licensee of WICU-TV and intervenor in this action, filed an Opposition to the Petition for Waiver and included

an engineering report (hereinafter termed the Smith report), purporting to measure the strength and quality of the signals of the two stations.[6] Field strength measurements were made at ten sites in the Meadville area. Interviews were conducted and observations of signal quality made at the stores of eight television dealers in the area. On October 24, 1966, the petitioner, MMA, filed a Reply to the Opposition of Lamb and included comments of TV dealers in the Meadville area and an Engineering Statement by Archie S. Taylor.[7]

On May 6, 1969, the Commission rejected MMA's petition for waiver of the non-duplication provisions of the Commission's rules.

Subsequently, MMA filed on June 5, 1969, a Petition for Reconsideration with an accompanying Motion to Stay.[8] MMA later submitted a supplement to the petition, including a subscriber survey and a resolution of the Meadville City Council asking for reconsideration, on June 24, 1969.[9]

On September 2, 1970, the Federal Communications Commission released a Memorandum Opinion and Order rejecting MMA's Petition for Reconsideration and Motion to Stay.[10]

90% of the time. (2) Grade A contour denotes a field in which the predicted service is 70% and 90%, respectively, and (3) Grade B contour demarks an area with a quality of service acceptable at 50% of the locations 90% of the time. See 47 C.F.R. §§ 21.710(c), 73.683(a) and 73.685(a)."

6. At the commencement of proceedings before the Commission, Lamb's official name was Lamb Enterprises, Inc. Subsequently its name was changed to Lamb Communications, Inc.

7. Supplemental materials to the statement were transmitted to the Commission on October 28, 1966. In reply, Lamb submitted on November 21, 1966, A Proof-of-Performance completed for the station by RCA Service Co., showing that WICU's transmitting equipment was operating in accordance with its station authorization. Two days later Lamb submitted a supplement to its Opposition to the Petition for Waiver, calling the Commission's at-

tention to the submission of the Proof-of-Performance and incorporating it in the Opposition by reference.

8. Oppositions to Motion to Stay and to the Petition for Reconsideration were filed by Lamb Communications, Inc. on June 12 and June 18, 1969, respectively. In return, MMA filed replies to these Oppositions on June 25, 1969.

9. An opposition to the supplement was filed by Lamb Communications, Inc. on July 1, 1969. MMA filed a reply on July 14, 1969.

10. MMA filed a motion to stay compliance with the Commission's directives until after disposition of its appeal to this court on September 24, 1970. The Commission released a Memorandum Opinion and Order on October 26, 1970, denying the petition. On November 5, 1970, petitioner filed in this court a Motion for Stay pursuant to section 2349 of the Judicial Review Act of 1950, 28 U.S.C. § 2349, requesting this court to stay the

Section 74.1109(c) (1) of the rules directs that a petition for waiver of the non-duplication rule shall set forth the "pertinent facts and considerations relied upon to demonstrate the need for the relief requested and to support a determination that a grant of such relief would serve the public interest." *See also* Shen Heights TV Association, 11 F.C.C.2d 814 (1968). Petitioner, in this case, contends that waiver of the non-duplication rule is justified because the signal strength of WICU-TV is such that its predicted contour does not in fact encompass large sections of the community and is in fact equal to or inferior to that of WFMJ-TV and because the quality of both black and white and color signals of WICU-TV is substantially inferior to that of WFMJ-TV. WICU-TV, the party seeking non-duplication protection, had the burden of establishing the applicability of section 74.1103 of the rules. This burden was fulfilled, as here, by establishing the predicted contours of the stations and the manner in which the CATV system has failed to provide non-duplication protection. See Shen Heights TV Association, 11 F.C.C.2d 814, 816 (1968); Bluefield Television Cable, 10 F.C.C.2d 731, 732–33 (1967). Then, the burden shifted to the CATV operators to demonstrate either that the rule is inapplicable because the contour does not, in fact, encompass the community or that waiver of the rule is warranted because of facts and circumstances which override the public interest determinations underlying the rule. Shen Heights TV Association, 11 F.C.C.2d 814, 816 (1968). Here MMA raises the issue of signal intensity not in an effort to show that section 74.-

1103 is inapplicable,[11] but as one of the facts and circumstances which, it is claimed, justifies waiver of section 74.-1103. In its Second Report and Order, the Commission recognized signal intensity as a basis for waiver, stating "carriage will not be required where a sufficient showing is made that a predicted signal is not in fact present in the community, or that a good signal is not obtainable because of technical deficiencies on the part of the station." Second Report and Order, 2 F.C.C.2d 725, 753 n. 40 (1966); see Bluefield Television Cable, 10 F.C.C.2d 731, 732 (1967). However, in a recent decision, the Commission added to the unfair competition and economic impact policies [12] underlying the non-duplication rule a third consideration, the allocations policy.[13] Apparently relying on the new allocations policy, the Commission narrowed the "facts and circumstances" which can justify a waiver and stated:

* * * CATV, as an interstate communication by wire which makes integral use of TV broadcast signals and particularly affects the service areas of stations, must observe the carriage and nonduplication requirements of our rules even though a viewable off-the-air picture is not available in any part of the CATV community, and may obtain a waiver of these requirements only upon a substantial showing of unusual or exceptional circumstances justifying such action. Shen Heights TV Association, 11 F.C.C.2d 814, 818 (1968).

This limitation apparently refers only to attempts to justify waiver on the grounds of signal intensity. *See* Com-

---

effectiveness of the Commission's order pendente lite. This court denied the motion for stay on November 30, 1970. This court also denied a Motion for Intervention filed by six subscribers to petitioner's cable system.

11. In its reply brief at p. 3, petitioner declares, "We must state again in these proceedings MMA did not raise the issue of the applicability of the rule but rather sought a waiver of the rule."

12. *See* note 2, *supra.*

13. In describing the allocations policy, the Commission, in its decision in *Shen Heights*, stated that because CATV "makes use of television broadcast signals as the *sine qua non* of its operation," it "must observe reasonable regulations designed to promote the public interest in this very area," such as the carriage and non-duplication rules.

munity Service, Inc. v. United States, 418 F.2d 709, 719–720 (6th Cir. 1969).[14]

MMA requests a waiver not only on the grounds of signal intensity but on the grounds of signal intensity combined with signal quality in black and white and in color. These considerations can, in our judgment, constitute "unusual or exceptional circumstances" justifying waiver.

As to signal strength, MMA alleged that the predicted contour of WICU-TV was not in fact present in large sections of the community.[15] In its relatively lengthy engineering study (hereinafter termed the Taylor report), MMA contended that "the median field intensity for the entire inhabited part of the City of Meadville is less than 56 dBu; less than Grade B." See App. 74.[16] Thus, petitioner claims that the actual contour of WICU-TV for the inhabited part of Meadville is less than the actual contour of WFMJ-TV. However, the Commission, in its order of May 1, 1969, merely stated that "It is clear that WICU-TV is entitled to priority on the Meadville system on the basis of predicted signals, and the possibility of actual discrepancies does not, of itself, provide a basis

for waiver of the program exclusivity requirement." The Commission's brief and conclusory reference to the "possibility of actual discrepancies" in response to MMA's allegations, supported by detailed evidence, that there were actual discrepancies, is not complete enough to permit us to exercise our judicial function of review.

The Commission's response to petitioner's evidence that the signal quality of WICU-TV was substantially inferior to that of WFMJ-TV, both in black and white and in color, is likewise unacceptable.

In its section on signal quality, the Taylor report notes the opinion of "casual observers" and of the authors that there is a noticeable difference in picture quality between WFMJ-TV and WICU-TV. Then the report describes a series of tests made concerning relative picture quality.[17] The Taylor report contended that as to black and white signal quality, the "WICU-TV signal as received in the area and at petitioner's antenna site is such that reception of WICU-TV was subject to chronic ghosting and that in addition to chronic ghosting, the WICU-TV signal was such

---

14. In its May 1, 1969, and August 26, 1970, memorandum opinions and orders, the Commission recognized that unsatisfactory color quality can justify a waiver. Thus, by implication, the Commission limited its comment in *Shen Heights* concerning "viewable off-the-air" pictures to considerations of signal strength.

15. Although MMA stated in its initial petition that "The signal strength of both stations might be classified as excellent," its subsequent engineering study, which was submitted to the Commission, contended the signal strength of WICU-TV was inferior to that predicted. See text *infra*. This contention was reiterated in petitioner's Reply to the Opposition of Lamb Enterprises, Inc. to the Petition of Meadville Master Antenna, Inc. for Waiver of the Nonduplication Provisions of Section 74.1103 and in its Petition for Reconsideration.

16. The Taylor report successfully answered, in our opinion, the relatively incomplete study of Smith Consulting Radio Engineers, submitted on behalf of WICU-

TV. Field strength measurements were taken at only ten sites, as compared with 100 sites in the Taylor study. Moreover, only four of the sites were in the city of Meadville and two of these were less than Grade B. See Comments on Carl E. Smith Measurements in Meadville in the Taylor report at App. 81–83.

17. Various steps, enumerated in the report, were taken in an attempt to assure that the viewing receiver, its tuning controls or the CATV plant were not the cause of the discrepancies. Tests involved viewing the pictures of two commercial RCA portable color TV receivers of identical type and model, placed side by side. Other receivers were also used. Some were connected to the CATV plant and some to antennas having no connection with CATV. On some sets, Channel 12 was converted to Channel 3 and Channel 21 was converted to Channel 4. On other receivers, no conversion was made. To eliminate the possibility of the CATV equipment being the cause of the difference, various tests described in the report were conducted at the CATV head end.

that there was a lack of definition and clarity in the picture to the point that the signal was noticeably inferior to that of WFMJ-TV." See Petition for Reconsideration. Taylor report. The report also purported to establish that WICU-TV's color signal was likewise inferior.[18] The report also attempted to establish that the inferiority was not due to degradation of the WICU-TV signal by CATV, by testing the signals at the cable head end.[19]

Although intervenor submitted an RCA Proof of Performance statement indicating that the WICU-TV equipment was operating properly at its transmission site, this report did not purport to test signal quality at the crucial point, the head end of the cable system where the signal is received by the antennae of MMA and begins its journey through MMA's cable to the receivers of subscribers.[20]

In the face of this evidence, the Commission, in its first Memorandum Opinion and Order, said nothing about black and white signal quality. Its comment as to the "possibility of actual discrepancies" in signal strength was not responsive to petitioner's allegations with regard to signal quality. In its September 2, 1970, Memorandum Opinion and Order, the Commission though referring obliquely to signal quality, again did not mention or attempt to respond to the Taylor report's data and conclusions with regard to black and white signal quality. It concluded that "[s]ince acceptable off-the-air reception is apparently available to a portion of the viewing population, and there has been no substantial showing that an acceptable WICU-TV signal is not available at the cable headend, the viewer survey does not constitute a substantial showing of unusual circumstances that justify a waiver of the rules."

18. The Taylor report stated that:
  1. There are distinctly observable differences between Channel 21 [WFMJ-TV] and Channel 12 [WICU-TV] requiring readjustment of brightness and chroma controls to obtain usable pictures. On some programs, on some receivers, even the best possible adjustments on Channel 12 [WICU-TV] were not pleasing, being too "green" or "yellow" particularly the flesh tones.
  2. These differences are in the broadcast signals, and are not caused by either the CATV equipment or the monitoring receiver used for the observation.
  *   *   *   *   *
From these tests and observations, it is concluded that Channel 12 [WICU-TV] is broadcasting a signal which is non-linear with respect to brightness levels; and that there is probably also significant differential gain and phase shift distortion associated with the non-linearity.
The report noted that photographs were taken without the necessary filters so that "the photographs do not even come close to representing the color balance observed visually during the tests. The photos are included, as Figures 5–7 of this report, since they do record the difference in brightness, and the loss of highlight detail."

19. The Taylor report stated that " *   *   * there is no question that the median cable subscriber in Meadville is receiving a far better picture from Channel 12 and from Channel 21 than is possible from a typical roof-top antenna at a median location in Meadville." See also note 17 supra.

20. The Taylor report successfully countered the findings of another study submitted on behalf of WICU-TV and completed by Smith Consulting Radio Engineers. In the Smith study, observations as to signal quality were made at the stores of eight dealers who use the cable distribution system of MMA. The comments concerning the observations were very subjective and brief. MMA's reply included the Taylor statement and affidavits from eleven of the fifteen television dealers in the Meadville area. Ten of these dealers made sworn statements as to the inferiority of the WICU-TV signal. WICU-TV did not attempt to meet the findings of the Taylor report except to file the RCA Proof of Performance, which shows that WICU-TV's equipment is operating according to the specifications of the Commission. It did not purport to test signal strength or signal quality at the receiving end.

Such terse and unilluminating conclusions represent an unsatisfactory response to the contentions and supporting evidence submitted by petitioner. Similarly unsatisfactory is the Commission's response to petitioner's contentions with regard to color quality.[21] In the May 6 Opinion and Order, the Commission stated, "Although inferior color signal has been recognized as a possible basis for waiver in par. 62, Second Report and Order, this consideration is inapplicable where, as here, 'the technical quality of the local signal [is] sufficiently good to permit satisfactory color reception on the cable.' There has been no allegation that reception of WICU-TV falls below this level."[22] In its Opinion and Order of September 2, 1970, the Commission stated "* * * [concerning] the argument that WICU-TV's color signal is subjectively less attractive than WFMJ-TV's * * * we again hold that paragraph 62 of the Second Report and Order controls this situation, and that as long as color reception of WICU-TV is satisfactory waiver is not warranted. And petitioner has not persuaded us that WICU-TV's signal is unsatisfactory."

■ If this court is to properly exercise its judicial function of review, it is necessary that the Commission consider the evidence placed before it and set out its conclusions with supporting facts and reasons. Community Service, Inc. v. United States, 418 F.2d 709, 717 (6th Cir. 1969); Cable TV of Santa Barbara, Inc. v. Federal Communications Comm., 428 F.2d 672, 681–683 (9th Cir. 1970); cf. Greater Boston Television Corp. v. Federal Communications Comm., 143 U.S.App.D.C. ——, 444 F.2d 841 (1970).[23]

---

21. In the Second Report and Order, the Commission, at 2 F.C.C.2d 725 (1966), stated at paragraph 62:

Some of the CATV comments urge us to go further and permit duplication of local colorcasts where a CATV system makes a showing that the technical quality of the local signal is substantially inferior to another signal. While we would, of course, consider any such showing on a case-by-case basis, we have no reason to anticipate any widespread problem warranting action by rule. We expect that valid complaints of this nature will be rare. In most instances the technical quality of the local signal should be sufficiently good to permit satisfactory color reception on the cable if the CATV system and the station cooperate in good faith to accomplish this result. We would expect good faith efforts by both to resolve any technical problem before any complaint is made to the Commission.

We note that petitioner alleges that beginning in late 1965 and several months before the Commission issued its rules on nonduplication, MMA informed WICU-TV of the unfavorable comments it had received regarding the color quality of WICU-TV broadcasts. Petitioner alleges that WICU-TV failed to make any improvements in the quality of the signal. If true, this may be a factor which the FCC will want to take into consideration on remand.

22. We think the Commission was wrong in stating that there had been no allegation of unsatisfactory color quality. While the word "unsatisfactory" may never have been used by petitioner, its references to color quality in its communications to the Commission, including the statements in the Taylor report, are such as to amount to an allegation of unsatisfactory color quality. However, this error in the Commission's May 6 opinion and order was corrected in its September 2 opinion and order (see text) which indicates that the Commission considered some evidence, however briefly, as to color inferiority and did not dismiss that part of the complaint on the grounds of the absence of a sufficient allegation.

23. In *Greater Boston*, the United States Court of Appeals for the District of Columbia stated at pp. —— – —— of 143 U.S.App.D.C., at p. 851 of 444 F.2d:

Assuming consistency with law and the legislative mandate, the agency has latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest. The function of the court is to assure that the agency has given reasoned con-

290

Nowhere does the Commission mention the Taylor engineering study or offer any analysis of its contents that could guide this court in its review of the Commission's treatment of this most important part of petitioner's evidence. The Commission gave no indication that it considered the evidence contained in the Taylor report submitted by petitioner as to signal strength or as to black and white or color signal quality. This it must do. Community Service, Inc. v. United States, 418 F.2d 709, 716 (6th Cir. 1969). Moreover, the Commission must set forth a "brief statement of the grounds for denial." 5 U.S.C. § 555(e). That statement must contain conclusions which are responsive to the evidence placed before it as to signal strength and as to black and white and color signal quality, and must contain the reasons upon which the conclusions are based. Community Service, Inc. v. United States, 418 F.2d 709, 717 (6th Cir. 1969); West Michigan Telecasters, Inc. v. F. C. C., 130 U.S.App.D.C. 39, 396 F. 2d 688, 691 (1968).

We do not think the Commission has fulfilled this obligation in its two opinions. Its conclusory, one-sentence re-

sponses referring to the "possibility of actual discrepancies" in signal strength or to the lack of a "substantial showing" of an "acceptable" signal at the cable head end or to "satisfactory color reception" are not acceptable. There is "no justifiable basis for the Commission's sweeping aside" with a few unenlightening phrases the fully supported allegations of petitioner. *See* Presque Isle TV Co. v. United States, 387 F.2d 502, 507–508 (1st Cir. 1967). The Commission, guided by the technical expertise at its command, may have good reason to find the evidence submitted in the Taylor report unconvincing.

■■ However, if there are fatally defective weaknesses in the evidence offered by petitioner, the Commission must disclose the nature of the defects. It must state with specificity its objections to the showing made by petitioner and not rely on conclusory and undefined terms such as "acceptable" and "satisfactory." We have before us the Taylor engineering study which appears on its face to offer such support for petitioner's position as to permit us to say, particularly when we also consider petitioner's other evidence,[24] that petitioner

sideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination. * * * Its supervisory function calls on the court to intervene not merely in case of procedural inadequacies or bypassing of the mandate in the legislative charter, but more broadly if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a "hard look" at the salient problems, and has not genuinely engaged in reasoned decision-making. * * * If satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned, though of course the court

must not be left to guess as to the agency's findings or reasons.

24. The evidence of dissatisfaction on the part of viewers and city council, submitted to the Commission in connection with petitioner's Petition for Reconsideration, lends support to petitioner's case. Petitioner mailed to its subscribers a letter explaining the Commission's May 6 action and making the following request:
If you wish to voice an objection to the FCC, we ask you to sign the enclosed card at the place indicated and mail it to us at once. * * * App. 192.
The following statement appeared on the card:
The undersigned Subscriber(s) to CATV service of Meadville Master Antenna, Inc., by the signing hereof, certify(ies) that the reception from Erie Channel 12 is consistently inferior to the reception from Youngstown Channel 21, both in black and white and in color; that for this reason the under-

has satisfied its burden of proof on the issue of waiver. *See* Shen Heights TV Association, 11 F.C.C.2d 814 (1968). We do not think anything submitted by petitioner or explained in the Commission's opinions overcomes the showing that intervenor has made. For the reasons stated, including the failure to state "the grounds for denial" and the absence of support for its action in the record when read as a whole, the summary denial of these petitions constitutes unreasonable and illegal action by the Commission. See 5 U.S.C. §§ 702 and 706; *cf.* Universal Camera Corp. v. National Labor Relations Board, 340 U. S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

For the foregoing reasons, we will set aside the May 1969 Commission order and remand the case to the Commission so that it may set forth in detail its conclusions and the reasons for them on the issues of signal strength, as well as on black and white and color signal quality.

signed definitely prefer(s) to view NBC programs shown by both stations at the same time on Youngstown Channel 21; and that the reception from Erie Channel 12 of color programs is not satisfactory.

The undersigned, therefore, strongly object(s) to Meadville Master Antenna, Inc., being required to delete the reception of NBC programs shown by Youngstown Channel 21 at the same time these programs are shown by Erie Channel 12. App. 194.

These cards were mailed on June 9, 1969, to 6,865 subscribers. Of the 2,597 reply cards received as of June 17, 1969, 2,588 cards containing 4,040 signatures certified as to the inferiority of reception from WICU-TV, as compared with WFMJ-TV. Nine of the reply cards containing eleven signatures indicated no inferiority of reception from WICU-TV compared to WFMJ-TV. In response to petitioner's argument that the survey supported its view that in many areas reception of WICU-TV's signal is inferior to that of WFMJ-TV, the Commission stated in its August 26, 1970, opinion that:

Petitioner invited its subscribers to write it if they felt WICU-TV's signal is inferior, in fact, to WFMJ-TV's signal on the Meadville system. While many subscribers apparently agree with petitioner, we do not believe it appropriate to accept a poll which attracts only dissidents since, presumably, persons who did not agree would have no reason to respond. Further, it is doubtful that viewers will fail to respond favorably to a survey that seems to offer the promise of better reception.

We agree with the Commission's criticism and feel the statement to which viewers were asked to affix their signatures could have been more carefully worded. However, we think there was at least some evidentiary value in the prompt response by a relatively high percentage of persons. Likewise, we think that the resolution of the Meadville City Council, expressing its belief that WICU-TV's signal is inferior to that of WFMJ-TV and its concern with the May 6 order of the Commission, is of at least minimal evidentiary value.