535 F.2d 214
 MEADVILLE MASTER ANTENNA, INC., Meadville, Pennsylvania, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Great Lakes Communications, Inc., Intervenor.
 No. 75-1889.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 8, 1975.
Decided April 12, 1976.
 
 George J. Barco, Yolanda G. Barco, Atty., Barco & Barco, Meadville, Pa., Frederick W. Ford, Pittman, Lovett, Ford & Hennessey, Washington, D. C., for petitioner.
 Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Lee I. Weintraub, Attys., Dept. of Justice, Washington, D. C., Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Acting Associate Gen. Counsel, Nancy B. Carey, Julian R. Rush, Jr., Counsels, F. C. C., Washington, D. C., for respondents.
 Herbert M. Schulkind, Peter Shuebruk, Alan B. Kaufman, Fly, Shuebruk, Blume & Gaguine, New York City, for intervenor.
 Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 In May 1971 this court set aside an order of the Federal Communications Commission denying the request of Meadville Master Antenna, Inc. (MMA), a community antenna television (CATV) system operator, for waiver of the non-duplication provisions of the rules of the Commission.[1] We then remanded the case to the Commission so that it might "set forth in detail its conclusions and the reasons for them" on certain key issues. On remand, the Commission ordered an evidentiary hearing on these issues, made findings of fact, and once again denied the waiver request. MMA's administrative appeal of this decision was unsuccessful and this court is now called upon to review the Commission's disposition of the matter since our remand. We deny the petition for review.
 
 
 2
 In 1966, the Federal Communications Commission adopted rules designed to afford operating television stations some protection against CATV systems.[2] These rules may be briefly described as follows. The Commission has categorized operating television stations for purposes of priority, which priority is determined by the stations' predicted signal strength over the CATV system's service community. The prediction is known as a contour. Meadville I, 443 F.2d at 284. Wheeling Antenna Co. v. United States, 391 F.2d 179, 181 (4th Cir. 1968). The non-duplication provisions of the Commission's rules[3] provide in essence that when a CATV system operates within a Grade B or higher priority predicted contour of any television station, the system must provide program exclusivity for that station at the latter's request against a station with a lower priority predicted contour. Nonduplication (i. e., exclusivity) means that the CATV system must refrain from transmitting programs of the lower priority station which are also carried, at the same time or at another time on the same day, by the higher priority station.[4]
 
 
 3
 The present case arose in 1966 when WICU-TV (Channel 12), Erie, Pennsylvania, requested non-duplication protection of its NBC network programming, from MMA, owner and operator of a cable television system in Meadville, Pa., against the NBC programming of WFMJ-TV (Channel 21), Youngstown, Ohio. In response, MMA petitioned for waiver of the non-duplication requirements.[5] The waiver was sought principally on the grounds that (1) the signal strength of WICU-TV is inferior to or no better than the signal strength of WFMJ-TV in most of Meadville and hence does not operate within the predicted contour which would require non-duplication protection; and (2) the signal quality of WICU-TV is substantially inferior to that of WFMJ-TV both in color and in black and white.[6] An additional ground, that there is a community of interest between Meadville and Youngstown, was also advanced.[7]
 
 
 4
 MMA supported its waiver request with a report prepared in October 1966 by Archer S. Taylor, a consulting engineer (hereinafter referred to as the Taylor Report), which contended that the median field intensity of WICU-TV's signal over Meadville was less than 56 dBu[8] or Grade B. According to the report, field intensity was measured at 100 locations corresponding to various intersections plotted along a grid of the map of Meadville, with the exclusion of "a number of intersections where it was quite apparent the field intensity would exceed 56 dBu," and intersections in uninhabited areas of Meadville.
 
 
 5
 As to signal quality, the Taylor Report asserted that the black and white, as well as color signal qualities, of WICU-TV were distinctly inferior to those of WFMJ-TV. This portion of the report was based on various tests comparing the picture quality of the two stations, a number of which were conducted at MMA's head end (the point where off-the-air television signals are received by cable television antenna and introduced into the cable system) to eliminate the possibility that MMA's equipment was the cause of WICU-TV's inferior signal quality.
 
 
 6
 Additionally, MMA supported its position with survey responses of MMA subscribers certifying to the consistently inferior quality of WICU-TV reception, and a resolution of the Meadville City Council expressing its belief that WICU-TV's signal is inferior to that of WFMJ-TV.
 
 
 7
 WICU-TV's licensee subsequently filed an Opposition to the Petition for Waiver. In support, it submitted a study prepared by Smith Consulting Radio Engineers, which contained measurements of the signal strengths of stations WICU-TV and WFMJ-TV taken at ten sites in the Meadville area, and measurements of the signal qualities of the two stations. It also submitted an RCA Proof of Performance Statement indicating that WICU-TV equipment was operating properly at its transmission site.[9]
 
 
 8
 In May 1969 the Commission denied the petition without hearing.[10] MMA subsequently filed a Petition for Reconsideration with an accompanying Motion to Stay, which were both denied in September 1970.[11] In both orders, the Commission failed to set forth in detail the agency's reasons for not adopting the Taylor Report or MMA's other evidence. Thus, on review, this court held:
 
 
 9
 We do not think anything submitted by or examined in the Commission's opinions overcomes the showing that petitioner has made. For the reasons stated, including the failure to state "the grounds for denial" and the absence of support for its action in the record when read as a whole, the summary denial of these petitions constitutes unreasonable and illegal action by the Commission. See 5 U.S.C. §§ 702 and 706; cf. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 
 10
 For the foregoing reasons, we will set aside the May 1969 Commission order and remand the case to the Commission so that it may set forth in detail its conclusions and the reasons for them on the issues of signal strength, as well as on black and white and color signal quality.
 
 
 11
 Meadville I, 443 F.2d at 291.
 
 
 12
 On remand, the Commission designated the matter for evidentiary hearing on the following issues:
 
 
 13
 (1) To determine (a) whether the community served by Meadville Master Antenna, Inc., is encompassed in whole or in part by the actual Grade B contour of WICU-TV, and (b) whether the actual signal contour of WFMJ-TV has the same or higher priority, in terms of the priorities established by Section 74.1103 (New Section 76.92) of the Commission's rules, compared with the actual signal of WICU-TV.
 
 
 14
 (2) To determine whether the technical quality of WICU-TV's black-and-white signal reception in the community served by Meadville Master Antenna, Inc., is substantially inferior to that of WFMJ-TV.
 
 
 15
 (3) To determine whether the technical quality of WICU-TV's color signal reception in the community served by Meadville Master Antenna, Inc., is substantially inferior to that of WFMJ-TV.
 
 
 16
 (4) To determine whether, in light of the evidence adduced on the above issues, a grant of the request for waiver would be consistent with the public interest.
 
 
 17
 34 F.C.C.2d 358, 359. All pleadings comprising the record in the case before this court were made part of the record on rehearing.[12]
 
 
 18
 At the hearing, held February 7-9, 1973, Jules Cohen, consulting electronics engineer for WICU-TV, testified concerning his observations and measurements in the Meadville area over periods totaling ten days in April, May, August, and November, 1972. Cohen's study of signal strength expanded the measurement-grid utilized by Taylor in 1966 from 43 to 58 intersections. The study included not only areas added to the City of Meadville since 1966, but also several uninhabited sections omitted by Taylor which had since become inhabited. Cohen concluded that the WICU-TV median field intensity in Meadville measured in excess of Grade B.[13] His measurements also revealed that at the head end of MMA's cable system WICU-TV measured at City Grade, the highest priority category, as against the lower priority Grade A measurement for WFMJ-TV.
 
 
 19
 On signal quality, issues (2) and (3) supra, Phillip M. Kane, a Commission engineer, testified that WICU-TV's picture was equal or superior to WFMJ-TV's picture. Kane's findings were based on various picture quality tests which included measurements of the CATV system's resolution (picture clarity and detail) at transmission point by the stations, at MMA's head end, and at carriage along the cable system. Picture quality was also evaluated in accordance with the TASO Picture Quality Rating Scale, which establishes a relation between the amount of interference of the picture reception and the opinion of a panel of laymen viewers as to the quality of the pictures.[14]
 
 
 20
 Cohen also testified on comparative picture quality. His testimony, based on independent observations, corroborated Kane's observations. His photographs and supporting testimony demonstrated that with the exception of four locations[15] WICU-TV's picture quality was superior to that of WFMJ-TV.
 
 
 21
 The Commission's Cable Bureau also contended that MMA had improved its cable facilities since 1966 by raising its WICU-TV receiving antenna from 611/2 to 109 feet, and that WICU-TV had installed new equipment to aid in color transmissions.
 
 
 22
 On the issue of public interest, MMA supported its position with evidence purporting to show public preference for WFMJ-TV. It again relied on the 1969 subscriber-response campaign and the June 1969 Meadville City Council resolution supporting its position in this proceeding. MMA also introduced the results of a 1973 telephone survey conducted by Richard Moodey, an Assistant Professor of Sociology at Allegheny College, Meadville.[16]
 
 
 23
 Question 6. If the NBC network programs coming from Youngstown Channel 21, which you receive on Cable Channel 4, were to be switched off from your cable service, so that NBC network programs would come in only through Erie Channel 12 (Cable Channel 3), would you approve or disapprove? How strong would your (approval/disapproval) be? (The following percentiles only reflect the number of responses.)
 
 
 24
 Strongly approve 3% (9)
Approve 16% (45)
Do not care 33% (92)
Disapprove 15% (41)
Strongly disapprove 33% (91)
No response 10
 
 
 25
 Comments made by respondents when they answered this question suggested that many of them were interpreting the question to mean that MMA had some valid internal reason to take this step. The 'Do not care' responses would then mean that subscribers would not take exception to the policy of the company. In order to test this, a second sample was drawn from the list of subscribers, taking every 25th name from the file. Of the 322 names so drawn, 241, or 75% answered a single question as indicated below.
 
 
 26
 When asked to indicate its degree of approval or disapproval of Commission action requiring MMA to omit the WFMJ signal the sample responded:
 
 
 27
 If the Federal Communications Commission requires that Meadville Master Antenna can only furnish NBC network programs from Erie Channel 12(your Channel 3), and requiring the switching off of these network programs from Youngstown Channel 21 (your Channel 4), would you approve or disapprove? How strong would your (approval/disapproval) be? (The following percentiles only reflect the number of responses.)
 
 
 28
 Strongly approve 0% (0)
Approve 8% (19)
Do not care 23% (56)
Disapprove 30% (71)
Strongly disapprove 39% (95)
No response 47
 
 
 29
 On August 21, 1973, the presiding Administrative Law Judge (A.L. Judge) released an initial decision denying MMA's waiver request.[17] On the issue of signal intensity, the following reasons were given in support of the denial of waiver:
 
 
 30
 Mr. Taylor's finding in 1966 that the median WICU-TV signal in Meadville was 0.2 dB less than 56 dBu cannot be accepted. Indeed, if his own data were plotted correctly and if measurements had been taken rather than assumed to be 56 dB at locations where the intensity was obviously (though it is not known how much) higher than 56 dB, his measured median signal of WICU-TV would have exceeded 56 dBu. He did not take measurements in uninhabited areas, whereas TASO makes no exception for them. In any event, these areas now appear to be populated, and, moreover, the boundaries of Meadville have been enlarged since Mr. Taylor's survey. Mr. Taylor also admitted to a probable meter error of about 1dB and conceded that there was an insignificant statistical difference between 55.8 dBu, his median field intensity, and 56 dBu. All these factors dictate the rejection of Mr. Taylor's calculation. The addition of Mr. Cohen's 16 field intensity measurements, all of which exceeded 56 dBu, to Mr. Taylor's measurements, furnishes a set of measurements at intersections distributed uniformly throughout the Taylor grid of Meadville. It is clear from these combined figures, if it were not already clear had Mr. Taylor's measurements been correctly plotted, that WICU-TV's median field intensity in Meadville is in excess of 56 dBu, the minimum for a Grade B contour. And at the critical location of MMA's headend, . . . where the off-the-air signals are received by MMA's antennas and introduced into its cable system, WICU-TV's measured at City Grade against a Grade A measurement for WFMJ-TV.
 
 
 31
 48 F.C.C.2d at 173-4. As to black and white and color picture quality, the A.L. Judge stated:
 
 
 32
 The evidence does not support MMA's contention that WICU-TV's picture quality, black and white or color, is substantially inferior to WFMJ-TV's. To the contrary, the evidence can only reasonably be construed to demand a conclusion that WICU-TV's picture is usually superior to the picture of WFMJ-TV.
 
 
 33
 Id. at 174. Detailed conclusions, relying on the picture quality tests of the Cable Bureau, Cohen, and Kane followed. The A.L. Judge also noted the change in reception conditions since 1966 (MMA's improvement of cable facilities and the installation of new equipment by WICU-TV to aid in color transmissions) as a basis for his conclusion.
 
 
 34
 On the issue of public preference, the A.L. Judge considered MMA's evidence and concluded that it lacked significant weight. He stated that the 1969 expression of customer opinion and the City Council resolution were "not related to current conditions." On the Moodey survey, he noted that Moodey had admitted on cross-examination that a respondent's failure to express a preference could mean that the respondent felt that the pictures of WICU-TV and WFMJ-TV were of equal quality. When all replies those favoring WICU-TV, those favoring WFMJ-TV, and those expressing no preference were considered, expressions of preference for WFMJ-TV were in the minority.[18] Thus the A.L. Judge concluded that "significant weight" could not be accorded the Moodey survey.
 
 
 35
 MMA filed exceptions to the A.L. Judge's findings and conclusion. A decision of the Review Board affirmed the denial of the waiver.[19] The Commission denied MMA's application for review by order dated April 29, 1975.
 
 
 36
 In reviewing the Commission's decision we note that our function is a limited one.[20] We may set aside the conclusions of the Commission only if we are satisfied that the Commission's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (A). Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971), which we cited in our previous consideration of this case, generally sets forth the role a court must assume in reviewing the Commission's rulings:
 
 
 37
 Assuming consistency with law and the legislative mandate, the agency has latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest. The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination. . . .
 
 
 38
 444 F.2d at 851.
 
 
 39
 At our first encounter with this action we stated:
 
 
 40
 If this court is to properly exercise its judicial function of review, it is necessary that the Commission consider the evidence placed before it and set out its conclusions with supporting facts and reasons.
 
 
 41
 443 F.2d at 289. The detailed findings and conclusions of the A.L. Judge and the Review Board now before us comport with this expression of the Commission's obligation.
 
 
 42
 The Commission reasonably concluded that the testimony of Kane and Cohen establish the predicted contours necessary to give WICU-TV non-duplication protection. The Taylor Report, as the Commission's analysis reveals, fails to reflect the actual contours as they exist today.
 
 
 43
 We find no fault with the Commission's treatment of the Moodey survey. Contrary to the dissent's suggestion that the Commission regarded the survey as irrelevant, the A.L. Judge's opinion carefully considers the survey in both its findings of fact and conclusions.[21] The dissent fails to consider the significant size of the "no response" category; there simply was not a clear majority favoring WFMJ-TV. The A.L. Judge's conclusion that the survey merited little weight because the results were attenuated by the "no responses" is not unreasonable.
 
 
 44
 On this record, we cannot say that the Commission has acted arbitrarily, capriciously, or in abuse of its discretion. The petition for review will be denied.
 
 
 45
 GIBBONS, Circuit Judge (dissenting).
 
 
 46
 I agree, not without misgivings, that there is a sufficient evidentiary basis in the administrative record to support the conclusion by the Federal Communications Commission that WICU-TV, Channel 12, Erie, Pennsylvania, projects a Grade B contour over Meadville. Thus I agree that under 47 C.F.R. § 76.92 (1975), WICU is entitled to signal priority over WFMJ-TV, Channel 21, Youngstown, Ohio, on the Meadville Master Antenna, Inc. (MMA) cable system. I do not agree, however, that the Commission's action on MMA's waiver petition can be approved.
 
 
 47
 When WICU requested signal priority, MMA petitioned for a waiver of compliance with the non-duplication rules. See 47 C.F.R. § 76.97. That petition put in issue both the signal strength and the signal quality of WICU's transmission. On May 6, 1969 the Commission, without a hearing, denied the petition for a waiver. 17 F.C.C.2d 506 (1969). On September 2, 1970 it denied a petition for reconsideration. 25 F.C.C.2d 315 (1970). On petition for review this court held that the Commission's brief and conclusory disposition of the waiver petition provided an insufficient basis for judicial review. We remanded to the Commission with directions to "set forth in detail its conclusions and the reasons for them on the issues of signal strength, as well as on black and white and color signal quality." Meadville Master Antenna, Inc. v. FCC, 443 F.2d 282, 291 (3d Cir. 1971). Thus we required an adequate administrative record and statement of reasons both on the issue of WICU signal strength (the Grade B contour issue) and on the issue of signal quality.
 
 
 48
 The Commission has frequently taken the position that signal strength contours are the beginning and end of the priority inquiry for purposes of the non-duplication rule. See, e. g., Shen-Heights TV Association, 11 F.C.C.2d 814 (1968); Bluefield Television Cable, 10 F.C.C.2d 731 (1967); Mission Cable TV, Inc., 4 F.C.C.2d 236 (1966). Indeed, in this case the Review Board relied on those cases. 47 F.C.C.2d 147 (1974). But in Meadville Master Antenna, Inc. v. FCC, supra, we rejected such an approach as inconsistent with the public interest. Signal strength contours are expressions of the median of measurements on a grid over an entire geographic area. See 47 C.F.R. §§ 73.683-.686. Particularly in mountainous terrain like that surrounding Meadville, signal strength contours may tell nothing at all about signal quality in inhabited regions. Thus in our prior decision we instructed the Commission to take into account actual black and white and color signal quality of the competing broadcasters. 443 F.2d at 291.
 
 
 49
 When we remanded in 1971 the administrative record contained the 1966 Taylor Report. Our remand specifically directed the Commission to respond to that report. 443 F.2d at 290. It did so by holding that conditions had changed since 1966, and that a new evidentiary hearing was required. The majority opinion approves this treatment of the Taylor Report. Although MMA argues that this Commission holding was inconsistent with our prior opinion, I do not quarrel with the majority's treatment of the reopening issue. Certainly the public interest permitted, if it did not require, the consideration of changed conditions.
 
 
 50
 But I cannot approve of the Commission's treatment of the evidence presented in the reopened hearing. In that hearing MMA supported its waiver petition with evidence of a random sampling of its subscribers conducted in January 1973 by one Moodey, an assistant professor of sociology trained in empirical methods. The survey included a sampling directed to 418 out of about 8000 MMA subscribers, of whom 288 responded. The survey showed that viewers expressed a preference for WFMJ's black and white picture quality by a 68% to 32% margin, and its color quality by an 81% to 19% margin. Particularly significant are the responses to questions 4 and 5 of the survey:
 
 
 51
 Although the Moodey survey strongly reinforced the findings of the 1966 Taylor Report, the Review Board cavalierly discounted its significance. Inexplicably, however, the Review Board made no finding that the opinion sampling was unfairly or inadequately conducted. The majority opinion justifies the rejection of the Moodey survey. But neither the Administrative Law Judge nor the Review Board explained why the survey results could not be afforded "significant weight." The suggestion that the failure of some persons included in the opinion sampling to express a preference should be given evidentiary significance in denigrating the weight to be given to the clear majority preference of those who responded seems to me completely inconsistent with the statistical assumptions which underlie the assumed validity of opinion surveying. Even the Commission did not, as does the majority opinion, convert a majority preference into a minority preference by treating the non-responses as equivalent to negative votes against the WFMJ signal. If the Commission had demonstrated why the Moodey poll was statistically insignificant or tainted I might be willing to approve its rejection. But as I read the decision under review, the Commission concluded that viewer preference as to signal quality was irrelevant to the waiver issue. I am simply at a loss to understand how that can be so.
 
 
 52
 The Communications Act of 1934 stipulates, and the Supreme Court has held, that the public interest is the polestar of Commission regulation. See 47 U.S.C. § 303; National Broadcasting Co. v. United States, 319 U.S. 190, 215-16, 63 S.Ct. 997, 1009, 87 L.Ed. 1344, 1362-1363 (1943). The non-duplication rule reflects one aspect of the public interest the protection of local television service from unfair competition by CATV systems which might import identical signals from distant markets. See, First Report and Order, 38 F.C.C. 683, 697-715 (1963); Second Report and Order, 2 F.C.C.2d 725, 734-45 (1966); Meadville Master Antenna, Inc. v. FCC, supra, 443 F.2d at 284 n.2; Titusville Cable TV, Inc. v. United States, 404 F.2d 1187, 1190 (3d Cir. 1968). But the viewing public also has an interest in receiving the highest quality signal available. That being so, its perception of signal quality cannot be dismissed as irrelevant. See Cable TV, Inc. v. FCC, 428 F.2d 672, 680-82 (9th Cir. 1970).
 
 
 53
 The summary rejection of the Moodey survey evidence convinces me that the Commission's action on remand was nothing more than a thinly-disguised effort to disregard this court's prior mandate directing it to take into account not only predicted signal strength contours but also actual signal quality. The Commission's present approach overemphasizes the guarantee of freedom from competition for local stations to the detriment of the competing interest of the viewing public. See Titusville Cable TV, Inc. v. United States, supra. The Commission's inflexible application of its non-duplication rule in this case, which results in the exclusion of a local signal in favor of a second, prima facie inferior local signal,[3] is in my view "arbitrary, capricious, an abuse of discretion, (and) otherwise not in accordance with law. . . . ." 5 U.S.C. § 706(2)(A). I would remand with instructions that the Commission weigh viewer preferences as to signal quality and explain why such preferences should not, in this case of marginal application of the non-duplication rule, control disposition of MMA's waiver petition.
 
 
 
 [1]
 Meadville Master Antenna, Inc. v. FCC, 443 F.2d 282 (3d Cir. 1971) (hereinafter Meadville I )
 
 
 [2]
 The facts of this case have been exhaustively set forth in Meadville I. A description of the functioning of CATV systems and the underlying policy reasons for the adoption of the non-duplication requirements also appears in our prior decision and will not be repeated here
 
 
 [3]
 At the time of Meadville I, the relevant rules were 74.1103(e), 47 C.F.R. § 74.1103(e), and 74.1103(f), 47 C.F.R. § 74.1103(f). See 443 F.2d at 284 n.4. These rules have since been revised, see 47 C.F.R. § 76.92 et seq., but the parties agree that the changes do not affect the relative priorities of the two stations involved in this case
 
 
 [4]
 The CATV system can carry the program of the lower priority station on the following day or thereafter if it desires
 
 
 [5]
 The petition for waiver was pursuant to 47 C.F.R. § 76.97
 
 
 [6]
 In our prior disposition of this case we stated: "These considerations (the grounds of signal intensity combined with signal quality in black and white and in color) can, in our judgment, constitute 'unusual or exceptional circumstances' justifying waiver." Meadville I, 443 F.2d at 287
 
 
 [7]
 A fourth ground, that the Commission's policy of encouraging the development of UHF television favors waiver since WFMJ-TV is a UHF station and WICU-TV is a VHF station, was also asserted
 
 
 [8]
 Field intensity contours or signal strength for television stations "indicate the approximate extent of coverage over average terrain in the absence of interference from other television stations." The unit used to measure field intensity is "dBu". See 47 C.F.R. § 73.683
 
 
 [9]
 In reviewing this statement in our earlier disposition, we noted that "this report did not purport to test signal quality at the crucial point, the head end of the cable system . . . ." Meadville I, 443 F.2d at 288
 
 
 [10]
 17 F.C.C.2d 506
 
 
 [11]
 25 F.C.C.2d 315
 
 
 [12]
 MMA petitioned for reconsideration of the hearing order, alleging that this court's remand did not authorize the Commission to direct an evidentiary hearing. The Commission rejected the petition in June of 1972. 36 F.C.C.2d 591. MMA then filed a motion with this court for an order to restrain hearing in this case in the absence of authority from the court. The motion was denied by order dated September 12, 1972
 
 
 [13]
 Of the 58 locations sampled, only 24 (or 41.4%) showed signal strength of less than Grade B level (56 dBu)
 
 
 [14]
 The tests utilized by the Taylor Study are detailed in Meadville I, 443 F.2d at 287, n.17
 
 
 [15]
 One location outside of Meadville and three locations in Meadville
 
 
 [16]
 The Moodey survey included a sampling directed to 418 MMA subscribers, of whom 288 responded. Questions and responses of the survey, with explanations, are set forth below. We have included respondents who failed to express a preference ("no response"). The sample subscribers who made "no response" were not indicated in the survey as presented to the Commission
 WICU-TV WFMJ-TV
 Erie Youngstown No
 Channel 12 Channel 21 Response
Question 1. "Meadville Master
 Antenna brings in more than
 one station for each network.
 If you can, please state your
 preference for:" 98 120 70
Question 2. "Please rate the
 quality of the black and white
 picture reception of the above
 stations. ' Good' means, 'consistently
 viewable;' 'Fair' means
 'viewable about half the time;'
 and 'Poor' means 'generally not
 viewable;' " (see Note below) 9 19 260
Question 3. (If respondent has
 color television) "Please rate
 the quality of the color reception
 of the same stations;" 11 47 230
 (Note: In Questions 2 and 3 any higher rating of one station than another was
 scored as a preference for that station. If one station was rated, but
 the other was not, this was scored as no preference.)
 Question 4. Which of the stations has the best quality black and white
 picture
 of the items listed:
 WICU WFMJ-TV
 Erie Youngstown
 Channel 12 Channel 21
 -------------------------- --------------------
(1) The least snow 36% (31) 64% (56)
(2) The sharpest picture 36% (33) 64% (59)
(3) The least double images 33% (24) 67% (49)
(4) The greatest contrast in
 the picture 36% (30) 64% (54)
 Question 5. Which of the stations has the best quality color picture of the
 items listed:
 WICU WFMJ-TV
 Erie Youngstown
 Channel 12 Channel 21
 --------------------- ------------------------
(1) The least snow 28% (40) 72% (104)
(2) The sharpest picture 26% (39) 74% (110)
(3) The least double images 26% (34) 74% (96)
(4) The most natural flesh
 tones 26% (37) 74% (105)
(5) The most consistent color
 quality 25% (36) 75% (106)[1]
 
 
 [17]
 The decision is reported at 48 F.C.C.2d 158 (1973)
 
 
 [18]
 See survey results detailed in note 16 supra. In most categories those replies expressing a preference for WFMJ-TV were a very small proportion of the total
 The A.L. Judge speculated whether MMA subscriber-respondents might be biased against WICU-TV. The proceedings before the Commission had been widely publicized in the community, and following the decision in Meadville I, MMA put out a release expressing delight with the court's reversal of the Commission's "illegal" action and openly favoring WFMJ-TV. Furthermore, while the order reversed in Meadville I had been in effect, MMA ceased carrying WFMJ-TV at all, except for an occasional program, thereby possibly creating the impression that if MMA lost its action with the Commission, subscribers would no longer receive WFMJ-TV. The A.L. Judge recognized that this possibility of bias was "conjectural" and explicitly made no finding on the point.
 
 
 [19]
 48 F.C.C.2d 147 (1974). In explaining its decision, the Review Board noted the existence of certain areas in Meadville that received poor reception from WICU-TV, evidencing a below normal signal intensity of WICU-TV. To determine whether these areas were sufficiently widespread to justify a waiver, the Board looked to the median value of WICU's signal intensity over the entire Meadville community. It found that it was in excess of Grade B, sufficient to entitle it to receive MMA exclusivity protection. With respect to signal quality, the Board adopted the findings of the A.L. Judge
 
 
 [20]
 Petitioners have contested the propriety of the Commission's directing an evidentiary hearing following the remand order of this court. The Commission indicated that it scheduled the new hearing because of a concern that, in view of the length of time which had elapsed since the preparation of the Taylor Report, the changes in both the CATV system and WICU-TV equipment, and changes in the geography and population of the service community, the original record did not contain sufficiently relevant information for a proper determination of issues sought by this court in its remand order. See 34 F.C.C.2d 359, 36 F.C.C.2d 591. The panel that decided Meadville I denied MMA's motion for an order restraining the hearing. See note 12, supra. That panel's order is dispositive of this issue. See also, FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656, 659 (1940); Easton Publishing v. FCC, 87 U.S.App.D.C. 344, 185 F.2d 987 (1950)
 
 
 [21]
 The Review Board's decision gives the survey shorter shrift, noting only that "such other evidence as photographs and viewer polls can at best be considered as a supplement to this technical showing." The Board's decision, however, shows that the record and the A.L. Judge's decision were carefully considered. Furthermore, the Board's opinion expressly adopts his findings and conclusions except as modified. This treatment is sufficient for us to conclude that the survey was given due consideration. It is not necessary for the Review Board to expressly discuss every point of an A.L. Judge's decision
 
 
 [3]
 Erie is 30 miles from Meadville while Youngstown is 45 miles away